## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**RAYMOND E. HECK, DOUG HAMLEY,**                    **CIVIL ACTION**
**CHARLES MOORE, JOSEPH MCKEARN,**
**ALLEN RICHARDSON**

**VERSUS**

**KENNETH K. BUHLER AND**                           **NO. 07-21-C-M2**
**WAYNE TRICHE**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in chambers in Baton Rouge, Louisiana, March 3, 2010.

_____
**MAGISTRATE JUDGE CHRISTINE NOLAND**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **RAYMOND E. HECK, DOUG HAMLEY,** | **CIVIL ACTION** |
| **CHARLES MOORE, JOSEPH MCKEARN,** | |
| **ALLEN RICHARDSON** | |
| | |
| **VERSUS** | |
| | |
| **KENNETH K. BUHLER AND** | **NO. 07-21-C-M2** |
| **WAYNE TRICHE** | |

**MAGISTRATE JUDGE'S REPORT**

This matter is before the Court on the Motion for Summary Judgment (R. Doc. 99) filed by defendant, Wayne Triche ("Triche"). Plaintiffs, Raymond E. Heck, Doug Hamley, Charles Moore, Joseph McKearn, and Allen Richardson (collectively "plaintiffs"), have filed an opposition (R. Doc. 105) to Triche's motion, in response to which Triche has filed a reply memorandum (R. Doc. 110).

**FACTS & PROCEDURAL BACKGROUND**

Plaintiffs filed this suit against Kenneth K. Buhler ("Buhler") and Triche on January 10, 2007.[1] On May 14, 2007, plaintiffs filed an amended complaint naming Daryl DeArmond ("DeArmond") as a defendant. In brief, plaintiffs' allegations are that Buhler, Triche, and DeArmond participated in fraudulent conduct to induce the plaintiffs to loan Buhler and/or his entity, Antiques Investment Group, L.L.C. ("AIG"), approximately $335,000.00 to ostensibly purchase antique inventory to be sold at a warehouse located at 212 14th Street in Baton Rouge. Plaintiffs contend that Triche, along with Buhler and

---

[1] Triche is a certified public accountant and is the principal in Triche & Associates, an accounting firm in Baton Rouge, Louisiana.

1

DeArmond, drafted the prospectus that was used to solicit their investments and that he made various misrepresentations in that prospectus designed to "impress prospective investors" with Buhler's financial success in the antiques and auction business, even though Triche was aware that Buhler was experiencing "severe financial difficulties" at the time the prospectus was drafted.[2]   Plaintiffs further contend that, contrary to the representations in the prospectus, Triche instructed Buhler to first place the plaintiffs' invested funds in the account of AIG and then transfer those funds out of the account to pay Buhler's business and personal debts, which Buhler did.

Specifically, plaintiffs allege that, pursuant to Triche's advice, Buhler granted a

---

[2] Specifically, in their opposition to the present motion, the plaintiffs list the following sixteen (16) alleged misrepresentations or omissions of material fact that are contained in the prospectus: (1) Participation is open to a limited number of investors; (2) The investors will make loans to the company, the proceeds of which will be used to buy inventory pool items; (3) The inventory pool will fully collateralize the loans; (4) A local CPA firm will provide the investors with independent accounting and oversight; (5) Buhler owns one of the most successful antiques and auction houses in the South; (6) Buhler had been recognized as the 75th largest antique dealer in the United States; (7) Buhler has earned the respect and trust of his customers over the years; (8) There are literally hundreds of dealers and designers in the Baton Rouge area that buy at wholesale from Ken Buhler Auctioneers, Inc. ("KBA"); (9) Buhler capitalizes on his auction business experience to earn a significant portion of its revenues; (10) The prospectus omitted to disclose that Buhler was not financially successful as indicated, but, actually broke; (11) The prospectus omitted to disclose that Buhler had been fired by Go Antiques; (12) KBA will conduct three to four major auctions per year; (13) Once the investor's loans are obtained, Antique Investments of Louisiana, LLC will provide the inventory necessary to stock the proposed new warehouse/showroom and strategically selected retail stores in specific high traffic locations; (14) All investments are secured by the inventory purchased; (15) Your investment is secured only by inventory; (16) The prospectus did not disclose that Triche was a Director and Shareholder of First Bank and from the outset planned to have Buhler pledge all of the inventory purchased with plaintiffs' funds to First Bank to enhance the bank's financial position as to Buhler's one million dollar debt to First Bank so that First Bank could be sold to State Bank in a transaction in which Triche would make a substantial profit.  *See*, Plaintiffs' opposition, R. Doc. 105, pp. 4-5.

security interest in the same antiques, collectibles, and quality reproduction inventory pool in which plaintiffs purportedly had a security interest relative to their investment contracts (*i.e.*, the AIG inventory pool) to State Bank & Trust Company ("State Bank") in exchange for a loan, without the knowledge or consent of plaintiffs.  Subsequently, Buhler and all of his entities, including AIG, defaulted on their loans with State Bank, and State Bank filed a petition for executory process and ultimately seized the AIG inventory pool.  State Bank then sold that inventory and thereby stripped AIG of all of its assets, leaving it bankrupt, and as a result, the plaintiffs lost all of the funds they had invested.

Plaintiffs asserted in their complaints in this matter that the conduct of Buhler, Triche, and DeArmond violates federal securities laws (*i.e.*, 15 U.S.C. §78aa, otherwise known as §27 of the Securities and Exchange Act of 1934 and, in particular, §10B and Rule 10b5 promulgated thereunder; and Section 29B of the Securities Exchange Act of 1934, and 15 U.S.C. §78cc(B) thereunder (the rescission claim)) and Louisiana's securities law (*i.e.*, Louisiana's Blue Sky law, La. R.S. 51:713(A)(2)).  Plaintiffs also contend that such conduct constitutes a breach of contract pursuant to La. C.C. art. 1758.  Although plaintiffs initially asserted other state law claims (*i.e.*, state law breach of contract, negligent misrepresentation, conversion, and fraudulent/intentional misrepresentation), those claims were dismissed by the Court as prescribed on November 30, 2007.  On July 27, 2009, Triche filed the present motion for summary judgment seeking the dismissal of plaintiffs' remaining claims against him (*i.e.*, plaintiffs' federal and state securities claims and their contract claims).   The motion was referred to the undersigned for a report and recommendation on February 3, 2010.

# LAW & ANALYSIS

## I.    Summary Judgment Standard:

Summary judgment is appropriate where the pleadings, discovery products, and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  A "genuine issue" exists when a reasonable jury could resolve the disputed fact(s) in favor of the non-movant, and a "material" fact is one that might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[3]  Only if the nonmoving party sets forth specific facts and evidence supporting the allegations essential to his/her claim will a genuine issue of material fact be found to exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[4]

## II.   Federal and State Securities Claims:

### (A)   Violations of Rule 10b-5 and La. R.S. 51:712A(2) (Louisiana's Blue Sky Law):

In a typical private action for securities fraud under §10b and Rule 10b-5, a plaintiff must prove:  (1) a material misrepresentation or omission made by the defendant; (2)

---

[3] In reviewing a motion for summary judgment, a court " . . .must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh evidence."  *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

[4] The nonmoving party may not rely upon pleadings, conclusory allegations, unsubstantiated assertions or arguments alone, but instead must come forward with evidence based on personal knowledge that demonstrates the existence of a material fact.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the record taken as a whole does not lead a rational trier of fact to find for the non-moving party, no genuine issue of material fact exists, and the mover is entitled to summary judgment as a matter of law.  *Id.*

scienter on the part of the defendant; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission by the plaintiff; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *Fener v. Operating Engineers Const. Industry and Miscellaneous Pension,* 579 F.3d 401, 406 (5th Cir. 2009); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200 (5th Cir. 2009). Louisiana's Blue Sky Law was modeled after the federal securities laws, and federal and state courts therefore interpret the Louisiana statute under the federal precedents. *Vale Natural Gas America Corp. v. Carrollton Resources 1990, Ltd.*, 795 F.Supp. 795 (E.D.La. 1992), citing *Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1131 (5th Cir. 1988). Thus, it is undisputed among the parties to this case that, if the plaintiffs can demonstrate that a genuine issue of material fact exists as to their federal securities claim, one likewise exists relative to their state securities claim.

### (1)    Material misrepresentation or omission:

Triche contends that plaintiffs will be unable to prove the first element of their securities fraud claim because they cannot produce any competent evidence that he actually wrote or drafted the prospectus containing the alleged material misrepresentations and omissions.[5]  However, Triche has not presented any jurisprudential support for the assertion that, to be held liable under Rule 10b-5 and Louisiana's Blue Sky Law, a violator

---

[5] All of the plaintiffs admitted in their depositions that the only alleged misdeeds by Triche relate to his involvement in the preparation of the prospectus; the plaintiffs conceded that Triche did not personally make any misrepresentations or omissions to them and did not in any way personally solicit them to invest.

must actually write/draft the prospectus.  Based upon the undersigned's review of the jurisprudence, some lesser involvement than the actual writing/drafting of the prospectus can result in liability under those statutes.  While the Fifth Circuit Court of Appeals has not recently articulated what degree of involvement is required, it appears that, if plaintiffs can prove that Triche rendered "substantial assistance" in the creation of the prospectus with a "general awareness" that such prospectus contained material misrepresentations and omissions, he can be held liable under Rule 10b-5.[6]

---

[6] In *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994), the U.S. Supreme Court abolished liability for those who "aid and abet" primary violators of Section 10(b).  The Supreme Court, however, did not completely absolve "secondary actors" in the securities market (such as lawyers, accountants, and other professionals) from liability.  The court held:

> Any person or entity, including a lawyer, accountant or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

*Id.*, at 1455.  Since *Central Bank*, courts of appeal and district courts have been split in their approach to determining when to impose primary liability on secondary actors. Some courts have adopted a "significant role" or "substantial involvement" test, while others have insisted that, under *Central Bank*, liability attaches only where the actor has made a false or misleading statement that was communicated to investors.  Some district courts have chosen to impose liability on conduct short of the actual making or drafting of the statement.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 583 (S.D. Tex. 2002).  The Fifth Circuit Court of Appeals has not defined the legal standard in that regard since *Central Bank*.  A court within this circuit, however, has held that "when a person, acting alone or with others, creates a misrepresentation . . ., the person can be liable as a primary violator . . . if . . . he acts with the requisite scienter."  *S.E.C. v. Hopper*, 2006 WL 778640 (S.D.Tex. 2006), quoting *Enron*, at 588, 590-91.  Under that test, a person who is not publicly associated with a misstatement can nevertheless be held liable as a primary violator if the person "was involved in creating the misstatement."  *Hopper*, at*9.  Furthermore, at least two courts within this circuit have continued to apply a pre-*Central Bank* test for "aider and abettor" liability that was articulated by the Fifth Circuit in *Abbott v. Equity Group, Inc.*, 2.

The evidence presented in this case indicates that, although Triche did not actually write/draft the prospectus,[7] he contributed conceptually to at least two (2) sections of that document on pages 6-7 regarding the financial "terms and conditions" of the investment opportunity.   *See*, Buhler deposition, pp. 110-112; 144-145; 291; 313-314; 329.[8] Additionally, during meetings with Buhler,[9] Triche apparently "scribbled" handwritten notes that were used by DeArmond (part-owner of Triche & Associates who worked in the business consulting division) in drafting the prospectus.  *See*, Buhler deposition, pp. 144-

_____

F.3d 613, 621 (5th Cir 1993).  *See, S.E.C. v. Shapiro*, 2008 WL 819945 (E.D.Tex. 2008); *S.E.C. v. Hopper*, 2006 WL 778640 (S.D.Tex. 2006); *S.E.C. v. Morris*, 2005 WL 2000665 (S.D.Tex. 2005).  Under that pre-*Central Bank* test, to establish "aider and abettor" liability, the plaintiff must prove that:  (1) the primary party committed a securities violation; (2) the defendant had a "general awareness of his role in the violation;" and (3) the defendant "knowingly rendered substantial assistance" in the achievement of the primary violation.

Considering that the Fifth Circuit has not set forth a defined standard for secondary liability since *Central Bank*, the undersigned, like the Southern and Eastern Districts of Texas, relies upon the *Abbott* test.  Such test does not require plaintiffs to prove that Triche actually wrote the prospectus.  Instead, it requires that they show that he rendered "substantial assistance" in the creation of the prospectus with a "general awareness" that such prospectus contained material misrepresentations and omissions.

[7] *See*, Affidavit of Triche, Exhibit A to Triche's motion; Buhler deposition, Exhibit J to Triche's motion, p. 25, 289.

[8] As an aside, the undersigned notes that, while Triche contends Buhler's testimony cannot be trusted, that is not a determination that the Court can make upon summary judgment.  At present, the undersigned must take Buhler's testimony at face value and save credibility evaluations for trial in this matter.

[9] Buhler testified that he met with Triche and DeArmond about five (5) or six (6) times to discuss the AIG prospectus as it was being written.  *See*, Buhler deposition, p. 127; 285.

145.[10]   Triche also apparently contributed to the private placement memoranda (or prospectus) of a prior entity in which Buhler had been involved, portions of which were incorporated into the AIG prospectus in question.  *See*, Buhler deposition, pp. 11; 29; 36; 110-111; 291-292; Triche deposition, Exhibit I to plaintiffs' opposition, pp. 82-84.[11]  Finally, and of most significance, Buhler specifically testified, on page 135 of his deposition, that DeArmond and Triche were the ones that "put" information in the prospectus concerning Buhler being successful in the auction business – one of the primary alleged misrepresentations in the prospectus that induced the plaintiffs to invest in AIG.  In light of

---

[10] According to Buhler, DeArmond did "almost all of the writing," but "nothing got out of Wayne Triche's office without him reviewing it and blessing it or denying it, one of the two."  *See*, Buhler deposition, p. 12; 110; 145.  Buhler also testified that the AIG prospectus was written at Triche's office; thus, it can be inferred from Buhler's testimony that, even if Triche did not actually write the AIG prospectus, he reviewed and "blessed" it before it left his office.  *See*, Buhler deposition, p. 112; 292 (where Buhler stated that Triche blessed the prospectus most of the way).

[11] Triche concedes in his present motion that his firm did extensive work with Buhler's prior entity, Go Antiques, which was a private and public offering of an online antique auction service started by Buhler.  Although Triche contends that most of that work was not performed by him specifically, there is evidence in this case, mentioned above in Footnote 11, that no work was released from Triche's office without Triche reviewing and blessing it.

Furthermore, Buhler's bookkeeper, Charlotte Glaspie, testified that the Go Antiques offering memoranda was used as a "base" for the prospectus in question.  She indicated that Buhler pulled the Go Antiques offering memoranda up on his computer and "went to Wayne to help him tailor it to whatever he was doing [with the AIG project]."  *See*, Glaspie deposition, Exhibit I to Triche's motion and Exhibit B to plaintiffs' opposition, p. 58.  The personal history portion of the AIG prospectus was apparently a "direct excerpt" from the Go Antiques offering memoranda that DeArmond had on his computer and which he incorporated into the AIG prospectus.  *See*, Buhler deposition, p. 249-250.  Glaspie specifically testified that Triche was involved in the preparation of the AIG prospectus, that he came to Buhler's office and met with him while the prospectus was being drafted, and that four or five drafts of the document went back and forth between Buhler and Triche before the prospectus was finalized.  *Id.*, pp. 48, 56, 68.

such evidence of Triche's participation in the preparation of the prospectus in question[12] and Triche's failure to produce any jurisprudential support for his position that his "involvement" with the prospectus was "far too remote" to result in liability, the Court finds that a genuine issue of material fact exists as to whether Triche can be held liable under Rule 10b-5 and Louisiana's Blue Sky Law for "substantially assisting" in the preparation of the AIG prospectus with general knowledge that it contained material misrepresentations and omissions.[13]

### (2)   Scienter:

The Fifth Circuit has defined "scienter" as acting with "a mental state embracing intent to deceive, manipulate, or defraud."  *U.S.S.E.C. v. Snyder*, 2008 WL 4218781 (5th Cir. 2008), quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003).  The scienter requirement can be satisfied by a showing of "severe recklessness," which is defined as:

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

---

[12] Although the various plaintiffs/investors also testified that they were told by Buhler and/or Glaspie that Triche was involved in the writing of the prospectus and in the formation of AIG, such hearsay testimony is not considered competent evidence for purposes of this summary judgment motion.

[13] Triche makes much of the fact that the plaintiffs did not actually receive the subject prospectus from him and that they did not discuss the terms and conditions of the prospectus with him; however, such actions are not required elements of proof for liability under Rule 10b-5.  As is discussed above, secondary actors, like Triche, can be held liable even though they do not directly solicit the investment as long as they made a material misrepresentation or omission in some way, such as through a prospectus.

*Goldstein*, at 245-46.

Plaintiffs' argument concerning scienter is that, at the time Triche was involved in the creation of the prospectus, he was aware that the AIG inventory and assets that had already been pledged to secure the plaintiffs' investments would be pledged to First Bank of Eunice (a bank for which he was on the board of directors and the loan committee and in which he owned stock)[14] to secure Buhler's million dollar debt to that bank and thereby enhance the bank's financial picture for purposes of sale. Triche contends such argument is a "red herring" and does not prove scienter at the time the prospectus was prepared because his alleged involvement in the preparation of the prospectus occurred as early as February 2003, while his involvement with Buhler's alleged debt to First Bank did not occur until over a year later in August 2004. Plaintiffs have produced invoices from Triche & Associates relating to work performed by Triche for Buhler that suggest to the contrary, however. Specifically, plaintiffs have produced invoices from November 2003 and December 2003, during the time period when Heck invested with Buhler[15] and within one to two months of AIG being formed on January 14, 2004, which reveal meetings that Triche had with Buhler and "bankers" concerning the restructuring of Buhler's debt and methods to generate cash flow for debt service. *See*, Invoice dated December 17, 2003, Exhibit K

---

[14] *See*, Buhler deposition, p. 140.

[15] The plaintiffs invested with Buhler on the following dates and in the following amounts: (1) Heck: September 12, 2003 ($30,000), November 19, 2003 ($20,000), February 3, 2004 ($20,000), March 8, 2004 ($5,000), March 12, 2004 ($18,000), April 1, 2004 ($10,000), April 1, 2004 ($4,561.65), April 1, 2004 ($5,386.30), and August 15, 2005 ($10,000); (2) Moore: May 2, 2004 ($100,000); (3) McKearn: February 6, 2004 ($37,000); (4) Hamley: February 5, 2004 ($25,000); and (5) Richardson: May 5, 2004 ($50,001). *See*, ¶¶14(a) through (e) of plaintiffs' Second Amended Complaint (R. Doc. 29), pp. 11-12.

to plaintiffs' opposition, p. 138 (stating "Meeting with client and bankers regarding loan package and restructure of present debt"); Invoice dated November 25, 2003, Exhibit L to plaintiffs' opposition (stating "Meeting with owners and bankers regarding operations, cash flow and various other matters, discussions with management regarding alternatives for operations, methods to generate cash flow for debt service and operations and assistance with income tax matters. . ."). Although Triche testified that he did "not know what bankers" were referred to in those invoices,[16] considering the timing of the invoices and Buhler's deposition testimony concerning the reasons for creating AIG and Triche's involvement in

---

[16] *See*, Triche deposition, Exhibit I to plaintiffs' opposition, p. 138.

the creation of that company,[17] [18] the undersigned finds that the invoices create a genuine issue of material fact as to whether Triche had a wrongful intent to deceive or manipulate investors at the time he participated in the creation of the AIG prospectus.[19]

---

[17] According to Buhler, he was fired from Go Antiques on December 20, 2002, and soon after that, Triche began helping him "get restarted again" in the antiques auction business. *See*, Buhler deposition, p. 42, 47-48; 369-370. Specifically, following his termination from Go Antiques, Buhler had some meetings with Triche in the Spring of 2003 where they talked about how Buhler could "get back on his feet" as an auctioneer. *Id.*, at 336; 370. Buhler also testified that, at the time AIG was formed and the prospectus was prepared, Triche knew "almost everything there was to know" about Buhler and his financial situation, which, at the time, was a dire situation. *Id.*, p. 49; 127-128 ("DeArmond and Triche both knew at the time they were writing the Prospectus that I was in very bad financial condition and had been for about three years); 140. Buhler further testified that he told Triche about various lawsuits and judgments that had been filed against him, some of which existed back in 2003 and 2004 when AIG was being formed and the prospectus was being prepared. *See*, Plaintiffs' opposition, p. 7-8, discussing that testimony; Buhler's deposition, pp. 60-61. He also testified that, at that time, Triche was aware of the three mortgages on Buhler's house and of Buhler's million dollar debt to State Bank. *Id.*, p. 61-62. Buhler also contends that he told Triche that a Cease and Desist Order had been issued by Louisiana's Auctioneer's Licensing Board in January 2004, prohibiting Buhler from conducting any auctions, and that Triche was aware, at the time AIG was formed, that he was having difficulty keeping his auctioneer's license, contrary to the representations in the prospectus. *Id.*, p. 69, 77. Buhler specifically indicated in his deposition that he believes Triche intended to deceive the plaintiffs/investors of AIG about Buhler's success in the antiques and auction business and about his financial condition because he was trying to put First Bank in the very best possible financial shape since the bank was being sold. *Id.*, p. 128.

[18] Triche's invoice to Buhler dated February 29, 2004 indicates that he was working on the formation of a new entity along with Buhler. Although Triche testified that he does not know the entity to which that invoice is referring, the timing of the invoice suggests (and Buhler's testimony confirms) that Triche was working with Buhler to organize and form AIG at that time. *See*, Exhibit J to plaintiffs' opposition (stating "2/29/04, Meetings, telephone conversations and correspondence regarding new entity ownership, formation and structure"); Buhler deposition, 91-92.

[19] While Triche contends that plaintiffs cannot prove scienter on his part because he did not gain anything from their investments, the undersigned finds that a genuine issue of material fact exists in that regard based upon the above-referenced invoices and Buhler's testimony, suggesting that Triche may have participated in a plan to have Buhler pledge the antique inventory (that had been previously pledged to plaintiffs) to

**(3)     Connection between the misrepresentations/omissions and the purchase or sale of a security:**

Triche makes no argument concerning this element of the Rule 10b-5 analysis in his motion and therefore does not appear to dispute the fact that the plaintiffs will be able to prove that the alleged misrepresentations/omissions contained in the prospectus were connected to plaintiffs' decision to invest in AIG.

**(4)     Reliance upon the misrepresentation or omission by the plaintiff:**

Triche also does not appear to dispute the fact that the plaintiffs relied upon the alleged misrepresentations/omissions in the prospectus in deciding to invest; however, he contends that such reliance was not reasonable because the plaintiffs failed to exercise due diligence prior to investing.   While "due diligence" is not technically stated as one of the elements of a Section 10(b) and Rule 10b-5 cause of action, federal courts have developed a requirement, as a corollary to the reliance element, that a plaintiff must have acted with due diligence with regard to the transaction in question.   4 Law Sec. Reg. §12.21 (6th ed. 2010)(citing various Fifth Circuit cases).   Since, in Rule 10b-5 cases, it must be proven that a defendant acted with scienter, a sense of balance has led many courts, including the Fifth Circuit, to require that the plaintiff's conduct be judged by the same standard.   *Id.*, citing *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir. ), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).   More recently, however, the Fifth Circuit has indicated that plaintiffs may, in fact, be held to a lesser standard of scienter than the defendant.   *Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478, 1491 (5th Cir. 1997)("[B]ecause the federal policy

---

First Bank to enhance the bank's financial position and make it easier to sell, so that Triche could benefit as a stockholder of that bank.

of deterring intentional misconduct in securities dealings outweighs the policy of deterring negligent behavior by investors, a plaintiff should not be held to a standard stricter than recklessness"); *Tranchina v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 1997 WL 472664 (E.D.La. 1997). Specifically, the Fifth Circuit has held that the standard for due diligence is "whether the plaintiff has 'intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Id.*, at 1490-91 (A plaintiff's conduct must indicate "a lack of due diligence amounting to recklessness" to bar recovery under Rule 10b-5); *Stephenson v. Paine Weber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1098 (5th Cir. 1988)(That "recklessness" standard has been followed without exception in the Fifth Circuit).[20]

As evidence that plaintiffs exercised due diligence prior to investing with Buhler and AIG, plaintiffs refer to their own deposition testimony, which reveals the following. Richardson testified that he met with Buhler at the home of Gary Alcorn ("Alcorn"), a banker who knew and recommended Buhler to Richardson. *See*, Richardson deposition, Exhibit C to plaintiffs' opposition, p. 35.[21] While at Alcorn's home, Buhler provided Richardson with a copy of the prospectus, and they "went over it some then" and discussed "the overall game plan." However, Richardson said he "wanted to think about it" and did not "get into [the prospectus] deep until after [he] left." *Id.,* p. 29-32. Richardson testified that he sat

---

[20] *Landry v. All American Assur. Co.*, 688 F.2d 381 (5th Cir. 1982)(A plaintiff should not be barred from recovering under Rule 10b-5 where he merely acts negligently; rather, at a minimum, he must have acted recklessly to have acted without due diligence).

[21] Richardson met Alcorn through another plaintiff in this litigation, Moore. *Id.*

and listened to Buhler and noted that Buhler "seem[ed] knowledgeable about antiques" and seemed to be a "good salesman." *Id.,* p. 45.   Richardson decided to invest after he "studied the Prospectus" and "did a search on Ken Buhler on the internet."   During his search, he found one negative item about "how [Buhler] was taken out of some other entity."   Richardson discussed that issue with "Charlie" [*i.e.*, Charles Moore, another plaintiff/investor in this suit] and Alcorn. According to Richardson, the issue was resolved to his satisfaction, and he decided to invest. *Id.*, p. 38; 43-45.  He specifically indicated that the prospectus itself is what enticed him to invest and that he "relied very heavily" on that document.  *Id.*, p. 37, 139, 170.  Because the investment was "four and a half years ago," Richardson could not recall whether he contacted Buhler between the time of that first meeting and the time he invested.  *Id.*, p. 38.

Moore testified that he was a personal friend of Richardson and that he relied upon Richardson's advice relating to investments.  *See*, Moore deposition, Exhibit D to plaintiffs' opposition, p. 36.  Moore also testified that his banker, Alcorn, called him and talked to him about possibly investing with Buhler.  *Id.*, p. 15.  Moore contacted Richardson, and he was also at Alcorn's house when Richardson met with Buhler.  *Id.*, p. 16.  Moore relied upon Alcorn's opinion that Buhler was "a very good auctioneer" and testified that Alcorn had purchased antiques from Buhler.  *Id.*, p. 17, 38.  According to Moore, while meeting at Alcorn's house, Buhler explained the outline of the investment as it is set forth on page six of the prospectus.  *Id.*, pp. 18-19.  Moore testified that he was told by Alcorn that "there was a huge amount [of] profit in antiques," and that is "what piqued [Moore's] interest."  *Id.*, p. 65.  He was "intrigued" by the investment because it "was supposed to be secured by

15

interest in the collateral in the antiques purchased." *Id.*, p. 25.  Following the meeting with Buhler at Alcorn's house, Moore read over the prospectus and discussed the investment opportunity with Richardson over the phone, and after that conversation, they both "decided to do it." *Id.*, pp. 19-21.

Heck testified that, before he invested with Buhler, he was told that Triche was helping Buhler with AIG, and Heck called Triche prior to investing.  *See*, Deposition of Heck, Exhibit E to plaintiffs' opposition, p. 37, 55.  Heck indicated that, although he did not know Triche personally at that time, he knew of his "good reputation." *Id.*, p. 37.  According to Heck, he called Triche to "verify" Buhler's statement to him that Triche was helping put together the AIG investment project.  *Id.*, p. 38.[22]  Heck testified that he "asked [ ] Triche [if] was he assisting Ken Buhler in putting together this Antique Investment Group deal . . . [and Triche said] yes . . . I asked him was he working with Ken on putting this together. I had received this Prospectus and wanted to know is this B-S or is this a real deal . . . and [Triche] said yes . . . I told Triche I had received a Prospectus . . . I asked [Triche] was he going to be overseeing this, looking into it.  Buhler professed [Triche] to be his accountant, financial advisor, you know, and so forth, and so on, and that's what I called to confirm." *Id.*, pp. 38-40.  Heck further testified that he relied on the prospectus in investing as well as "the fact that [Triche] had told [him] . . . [he had] oversight in working with [Buhler] in taking this project forward." *Id.*, pp. 76-77; 120; 123 ("I look upon Mr. Triche's . . . involvement as a professional involvement as a CPA firm . . . He was part of the equation that helped me make my decision to invest in this endeavor").  According to Heck, part of

---

[22] According to Buhler, he had also known Heck for approximately nine (9) years before Heck invested in 2003.  *See*, Buhler deposition, p. 293.

the reason he decided to invest was because the prospectus represented that "a local CPA firm will provide investors with independent accounting oversight." *Id.*, p. 124.

McKearn testified that Buhler told him he was "having a prospectus prepared, that he was trying to put together an investor group and he wanted to see if [McKearn] would be interested in looking at it when it was done and [McKearn] said, yes." *See*, McKearn's deposition, Exhibit G to plaintiffs' opposition, p. 51.  Buhler then provided McKearn with a copy of the prospectus, and he reviewed it before deciding to invest.  *Id.*, pp. 54-55.

Finally, Hamley testified he met Buhler through McKearn.  McKearn owned the warehouse where AIG's antique inventory was to be sold.  McKearn told Hamley that he was going to invest with Buhler, and Hamley indicated that he might be interested in investing as well.  *See*, Hamley deposition, Exhibit H to plaintiffs' opposition, pp. 23-24.  McKearn informed Hamley that Buhler "had been an auctioneer in Louisiana for a long time."  *Id.*, p. 25.  Hamley met Buhler with McKearn at the warehouse owned by McKearn, and then Buhler later traveled to Covington, Louisiana, to meet with Hamley and discuss the investment opportunity.  *Id.*, pp. 25-26.  Based upon his discussions with Buhler, Hamley believed the investment opportunity to be "very viable."  *Id.* , at 23.  McKearn and Hamley read the prospectus together prior to investing.  *Id.*, pp. 32-34.  Hamley testified that he "put a lot of credence into [McKearn's] decisions from a legal and friend standpoint." *Id.*  Hamley looked at the warehouse and thought that "it looked like a great deal . . . [Buhler] had done a beautiful job of merchandising the warehouse."  *Id.*, p. 38-39.  According to Hamley, "[i]t looked like a good situation . . . and [McKearn] had confidence in the business and I did, too . . . I thought that [the] Prospectus looked really good."  *Id.*,

pp. 41-43.  In fact, Hamley indicated that, in deciding to invest, he relied upon all of the prospectus, "particularly page 6."  *Id*., p. 183.

Buhler also testified that he gave all five plaintiffs the prospectus before they invested and that he is sure the plaintiffs asked him questions about the prospectus and about the antiques business in general prior to investing.  *Id*., p. 301-302; 310-311.  Moore, in particular, asked Bulher about his Go Antiques endeavor, and Buhler indicated that he "told him directly an answer."  *See*, Buhler deposition, pp. 311.  Buhler also testified that he met with Heck "probably . . . on six occasions . . . and he asked questions" about AIG.  *Id*., pp. 366-367.

Considering the above testimony, it appears that all five of the plaintiffs/investors relied upon the prospectus in deciding to invest and that they believed the prospectus to be, as they indicate in their present opposition, a "professionally well-written" document.  Some of the plaintiffs corresponded with one another concerning the investment opportunity and Buhler's reputation.  One investor conducted internet research as part of his investigation, and another contacted Triche to determine whether the opportunity was a legitimate and viable one.[23]  Given those precautions and investigation, a genuine issue of material fact exists as to whether or not the plaintiffs acted with due diligence in deciding

---

[23] Although Triche contends that Heck's testimony reveals only that Heck contacted Triche to ask him if he was assisting Buhler with AIG, the undersigned interprets Heck's testimony to reveal more than Triche's interpretation.  Specifically, the undersigned finds that, while Heck contacted Triche to find out if he was involved in the AIG project, he also contacted Triche to obtain information as to whether the project was a legitimate one and whether it was going to be overseen by Triche since he was an accountant.  It appears that Heck felt more comfortable and decided to invest after Triche confirmed that he was involved and would be providing accounting oversight to the project.

to invest with Buhler and AIG.  Put another way, the undersigned cannot conclusively find that the plaintiffs "intentionally refused to investigate in disregard of some risk that was known or had been made obvious to them and which was highly probable to result in harm," such that Triche would be entitled to judgment as a matter of law on the reliance element of plaintiffs' Rule 10b-5 claim.

Furthermore, although Triche asserts, in his present motion, that, in order to fulfil the due diligence requirement, plaintiffs should have "requested or reviewed pro forma statements, balance sheets, income statements or any documents pertaining to Buhler's financial situation prior to investing"[24] and should have discussed the investment opportunity with an attorney or financial advisor, Triche has not presented any jurisprudential support for that assertion, and the undersigned finds that, while such thorough investigation would be conscientious prior to investing, it cannot be said that such investigation is required for an investor's reliance to be deemed reasonable, considering the Fifth Circuit standard mentioned above.[25] [26]  Accordingly, the undersigned finds that

---

[24] Specifically, Triche contends that, in addition to reviewing pro forma statements and budgets, plaintiffs should have contacted an attorney to run a mortgage check or check for judgments against Buhler at the courthouse, should have requested any financial statements from Buhler's multiple previous entities, and should have asked about how much commission Buhler would be paid from the sale of antiques or for purchase of antiques from wholesalers.  *See*, Triche's supporting memorandum, p. 8.

[25] The Fifth Circuit standard appears to require a more deliberate disregard by the investor of information that creates a "red flag" concerning fraudulent behavior. *See, Dupuy*, at 1020 (In Rule 10b-5 damage action brought by seller of stock in close corporation on allegations that purchaser misrepresented and failed to disclose material facts regarding value of such stock, question was not whether or not seller acted unreasonably by failing to investigate condition of corporation, but instead was whether seller *intentionally refused* to investigate in disregard of risk known to him or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow); *Tranchina v. Howard, Weil, Labouisse, Friedrichs,*

_____

*Inc.*, 1997 WL 472664 (E.D.La. 1997)(where an investor was held to have failed to exercise due diligence because he *ignored* warnings from the defendants on his statements regarding the investments at issue, *ignored* a variance from the defense procedures with which he was familiar with regard to the payments for stock, and *ignored* the consistent lack of confirmation regarding the stock transactions, repeatedly for a long period of time.  The investor's conduct was considered to be reckless); *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095 (5th Cir. 1988)(Investor's delay in reporting allegedly unlawful trades and his failure to read Paine Webber correspondence containing accurate and detailed information about his accounts, even after he became fully aware that those accounts were not being properly handled was held to rise above mere negligence to the level of recklessness, as is required for a finding of no due diligence.  The court noted that the investor was sufficiently knowledgeable and in control of his affairs to have reviewed his Paine Webber statements and discern a pattern of error.  Those facts, "together with the district court's expressed doubt about [the investor's] credibility at trial," were held sufficient to support the district court's finding of recklessness).

Triche cites *Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100, 103 (5th Cir. 1970) for the proposition that recovery should be denied to the plaintiffs because, due to their business sophistication, expertise, and acumen in the financial community, they could reasonably be expected to exercise a higher degree of care and investigation in their investment dealings.  Even assuming that is true, *Clement* does not indicate that the plaintiffs had to go to the lengths suggested by Triche to fulfill the due diligence requirement.  In fact, *Clement* again suggests that, in order for an investor's conduct to be considered sufficiently reckless to constitute a lack of due diligence precluding recovery, the investor must deliberately ignore and fail to investigate a "red flag" concerning fraudulent behavior.  In *Clement*, the court found a lack of due diligence on the part of the plaintiff stock-brokerage firm because it continued to accept the defendant-customer's personal checks after prior checks had been dishonored for insufficient funds, even though the normal business practice in the event of such an irregularity was to freeze the customer's trading account for a period of ninety days.

There is at least a genuine issue of material fact in the present case as to whether the plaintiffs exercised due diligence prior to investing since it does not definitively appear, based upon the evidence currently in the record, that anything the plaintiffs learned about Buhler and AIG either from Buhler himself, from the prospectus, from their fellow investors, or from others (Alcorn or Triche) raised a "red flag" that Buhler was engaging in fraudulent behavior warranting additional investigation by the plaintiffs.  Although Richardson admits that he saw one item during his internet search concerning Buhler being "taken out" of another entity, he apparently discussed that issue with another investor and a banker (Alcorn) before deciding to invest.  At the summary judgment stage, the undersigned is not prepared to say that such discussions were insufficient to constitute due diligence.  Furthermore, in *Siebel v. Scott,* 725 F.2d

20

plaintiffs have presented sufficient evidence to survive summary judgment on the reliance element of their claim.

### (5)    Ecomonic Loss and (6) Loss causation:

Triche did not address either of these elements in his motion and therefore has not disputed that plaintiffs can prove these final two elements of their Rule 10b-5 claim. Accordingly, because genuine issues of material fact exist as to whether plaintiffs can prove each element of their claims under Rule 10b-5 and La. R.S. 51:712A(2), Triche's motion for summary judgment as to those claims should be denied.

### (B)    Section 29(b) claim (rescission claim):

Pursuant to §29(b) of the 1934 Securities and Exchange Act, 15 U.S.C. §78cc(b), an innocent party may void a contract if:  (1) the contract was made or performed in violation of the securities laws; (2) the plaintiff is in contractual privity with the defendant; and (3) the plaintiff is in the class of persons the statute was designed to protect.  *Abbott v. Equity Group, Inc.*, 2 F.3d 613 (5th Cir. 1993).  Triche correctly argues that §29(b) does

---

995 (5th Cir. 1984), the Fifth Circuit found that, where limited partners put their faith in the individual who controlled the general partner with which they invested to represent their best interest and deal with them fairly and truthfully, and nothing that individual told the limited partners in procuring sales of their limited partnership interests was so "inherently implausible" that they were under a duty to investigate further, the district court's conclusion that the limited partners exercised due diligence was not clearly erroneous.  *Id.*, at 1000-1001.  The issue of whether any of the information concerning Buhler and AIG to which plaintiffs were privy prior to their investment was so "inherently implausible" that they had a duty to investigate it further is sufficiently disputed to proceed to trial.

[26] Triche has also failed to present any evidence demonstrating that there was a risk either known or obvious to the plaintiffs concerning their potential investment with Buhler that they ignored and intentionally refused to investigate.

not apply to plaintiffs' claims against him because plaintiffs do not have contractual privity with him.  The evidence indicates that the plaintiffs met only with Buhler prior to investing in AIG and only made payments to and received promissory notes from AIG [or, in the case of Heck (who initially invested before AIG was formed), in one of Buhler's other entities]; thus, there is no basis for finding that a contract exists between plaintiffs and Triche.

Furthermore, the undersigned agrees with Triche that, even if plaintiffs' corporate veil-piercing theory was applied and the corporate veil of AIG was pierced,[27] Triche still could not be held liable under plaintiffs' contract theories since there is no evidence that he was a member of or had any equity interest in AIG.[28]   Accordingly, plaintiffs' §29(b) rescission claim against Triche should be dismissed.

**III.    Breach of contract claim:**[29]

Because plaintiffs have not presented any evidence demonstrating that Triche was in privity of contract with them or that he was a member or otherwise had an ownership

_____

[27] Plaintiffs argue that AIG was simply a "front" or "sham" used to sell the investment contracts at issue and that the investment contracts are actually between the "persons who made the covenants in the contract, Triche, DeArmond, and Buhler, and each plaintiff," such that the corporate veil of AIG should be pierced, allowing plaintiffs' contract claims to proceed against Triche.

[28] *See*, Triche Affidavit, Exhibit A to Triche's motion, ¶¶14-15 (where Triche attests to the fact that he never had a contract of any kind, verbal or written, with the plaintiffs and that he has never been an owner or member of an entity that had a contract with the plaintiffs).

[29] In this claim, plaintiffs contend that Triche, DeArmond, and Buhler breached the investment contracts they sold to plaintiffs because they failed to perform the covenants contained in those contracts and because the contracts contained material misrepresentations and omissions.

22

interest in AIG, such that he could be held liable if the corporate veil of AIG was pierced, plaintiffs' breach of contract claims against Triche should likewise be dismissed.

## **RECOMMENDATION**

For the above reasons, it is recommended that the Motion for Summary Judgment (R. Doc. 99) filed by defendant, Wayne Triche, should be **GRANTED IN PART**, in that plaintiffs' Section 29(b) rescission claim and breach of contract claim against Triche should be dismissed with prejudice, and **DENIED IN PART**, in that plaintiffs' claims against Triche pursuant to §10b and Rule 10b-5 and pursuant to La. R.S. 51:712A(2) should not be dismissed.

Signed in chambers in Baton Rouge, Louisiana, March 3, 2010.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

23